**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 20-12-DLB-EBA**

**BILLY LEMASTER, et al.**                                                         **PLAINTIFFS**


**v.**                                **MEMORANDUM OPINION AND ORDER**


**LAWRENCE COUNTY, KENTUCKY, et al.**                               **DEFENDANTS**

* * * * * * * * * * *

## I.      INTRODUCTION

This is a First Amendment retaliation action brought under 42 U.S.C. § 1983 by Billy and Amanda Lemaster, doing business as Lemaster Towing and Recovery, against Lawrence County, Kentucky, and Judge Executive Phillip L. Carter, in his individual capacity.  The matter is currently before the Court on Defendants' Motion for Summary Judgment (Doc. # 53), which has been fully briefed (Docs. # 58 and 61) and is thus ripe for the Court's review.  For the reasons stated herein, Defendants' Motion is **granted**.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Like many rural towing companies, Lemaster Towing and Recovery relies on tow calls from its county government for a significant share of its business.  (*See generally* Doc. # 1).  In short, when the Lawrence County 911 dispatchers send for tow trucks, they use a rotating list of towing companies to determine which company gets the call, and in turn, which company can bill the County for its services.  (*Id*. ¶ 1).  In Lawrence County, Lemaster Towing is one of six companies on the County's towing list.  (*Id*. ¶ 6).

1

In 2019, Billy Lemaster noticed that his towing company seemed to be receiving few or no calls at all from the County, and he expressed his concerns to Phillip Carter, who had recently been elected Lawrence County Judge Executive.  (*Id*. ¶ 8 and 9).  After Carter assured Lemaster that he would investigate the tow call rotation, in April 2019, Lemaster made a Facebook post criticizing the County for firing an EMS employee.  (*Id*. ¶ 11).  That Facebook post has since been deleted, as Carter reached out to Lemaster, requesting that he delete the post, because Carter believed it reflected poorly on the County and on his administration as Judge Executive.  (*Id*. ¶ 12).  According to Lemaster, Carter offered to "make sure" Lemaster Towing would receive more towing calls from the County "in exchange" for Lemaster removing the Facebook post.  (*Id*. ¶ 13-14).  But according to Carter, his request was not a quid pro quo, and he instead only admitted to Lemaster that he had forgotten to contact the dispatchers to inquire about the towing rotation.  (Doc. # 53 at 2).  After that conversation, Lemaster Towing received more calls from the County, and had a "steady volume of tow calls throughout the summer of 2019." (Doc. # 1 ¶ 16).

But during the summer, things went south between Carter, Lemaster, and by extension, the County and a volunteer fire department.  (Doc. # 58 at 2).  At that time, in addition to owning Lemaster Towing, Lemaster was also serving as the chief of the Cherryville Volunteer Fire Department in Lawrence County.  (Doc. # 1 ¶ 17).  According to Lemaster, Carter began singling out the Cherryville Fire Department during that summer and was "substantially interfering with operations" at the department.  (*Id*. ¶ 17). More specifically, in July 2019, a dispute arose between Cherryville and Carter over a piece of equipment used by the fire department.  (Doc. # 58 at 2).  The fire department

ordered work on an "army 6x6" that it misclassified as a "dozer," which led Carter to believe the Lemasters were receiving a kickback from the fire department.  (*Id.* at 3). Carter then called the state police to investigate, but the police found no evidence of wrongdoing.  (*Id.*).

The Lemasters also allege that during that summer, Wilma McKenzie, a "supporter" of Carter's, set out on a "smear campaign" against the Lemasters in a bid to do Carter's "dirty work," spreading a rumor around Lawrence County that the Lemasters had stolen from the fire department.  (Doc. # 58 at 3).  In August 2019, in the wake of the Cherryville dispute and the deteriorating relationship between Lemaster and Carter, Lemaster logged onto Facebook to write something that was "strictly his opinion" (Doc. # 42-1 at 147:1), to the extent that a rhetorical question about a personal relationship can be strictly an opinion.  Lemaster's post stated "Is Phillip L. Carter (tag included) and Wilma Mckezie [sic] a couple now? Asking for a friend[.]"  (Doc. # 53 at 3).  At some point in September 2019, Billy Lemaster resigned as Chief of the Cherryville Fire Department. (Doc. # 1 ¶ 20).

During the same time frame, apparently unrelated to the Cherryville dispute and Lemaster's Facebook post about his relationship status, Carter became aware that Cherryville was "frequently unresponsive" to calls from dispatch, and so on September 3, 2019, he directed the County dispatch to contact the next-nearest fire department when Cherryville was unresponsive.  (Doc. # 53 at 4).  Carter states that his directive to dispatch was made on the instructions of the Kentucky Fire Commissioner, while Lemaster believes it was intentional retaliation for the ongoing disputes between Carter and

Cherryville and the Lemasters, involving the fire equipment and the April 2019 Facebook post. (Doc # 58 at 3).

On September 3, 2019, Jill Jackson, an assistant director in the County dispatch, then relayed an email to dispatchers stating that Cherryville was not to be dispatched *at all*, in addition to Lemaster Towing. (Doc. # 58 at 5). Carter argues that a simple miscommunication occurred (Doc. # 53 at 4), while the Lemasters believe it was deliberate. A few days later, Carter contacted dispatch to send out a corrective email, which stated that Cherryville was to be dispatched, and then passed over only if they did not respond. (*Id.* at 5). However, the email did not clarify that Lemaster Towing was still in rotation on the County tow list. (*Id.*).

According to Lemaster, the towing company experienced a sudden drop in the amount of tow calls, while other companies were receiving a higher volume. (Doc. # 58 at 5-6). Defendants, however, state that the number of tow calls received by Lemaster Towing between October 2019 and February 2020 was on par with other County towing companies. (Doc. # 53 at 5). In October 2019, the Lemasters filed an Open Records Request to obtain the towing records, and they state that the County provided them with a response including specific, unrequested rationales for as to why Lemaster Towing may have been passed up from time to time on the tow call list. (Doc. # 58 at 6).

In the months that followed, the Lemasters allege that Carter and McKenzie upped the ante on their "smear campaign" against the Lemasters and Cherryville Fire, setting out to dismantle the fire department by "disseminating misinformation . . . that [the] Cherryville fire department did not have a building, trucks or firemen to receive state

4

funding."[1]   (*Id.* at 6).   McKenzie apparently started a petition to have the Cherryville department administratively dismantled, in accordance with what Carter stated in his deposition was a state fire commission procedure.   (*Id.* at 6-7).   While circulating the petition, McKenzie also stated that Lemaster had been indicted for stealing, when he had not.   (*Id.* at 7).   Otherwise, during this time, the conflict centered around the fire department's building, repairs ordered by the department, and a building inspector who Lemaster believes was sent by Carter to delay the repairs.  (*Id.* at 7).  Carter disputes that he called the building inspector.  (Doc. # 53 at 6).

In March 2020, further incensed by the "smear campaign" and the problems with the Cherryville Fire building inspection, Billy Lemaster took to his keyboard, again logging into Facebook to caustically update his internet friends about happenings in Lawrence County.  The post stated:

> Oh the holler hag Wilma McKenzie and Phil Twotter are at it again god love their black hearts [ ] maybe before assuming someone is doing something for pure pleasure maybe they should ask for answers from the horses mouth!  I don't keep a fire engine parked outside for my own pleasure I park it there because it's the only safe place since we were lied to by the county Judge!  After pissing him off talking about his one true love Wilma we were shafted on our building project!  Now 8000$ dollars are lying on the floor and will not be moved out of fear of being accused of stealing yet again! Phil promised to help us fix up the place then proceeded to call the building inspector on us!

(Doc. # 53 at 6).

Still not receiving what they believed to be an adequate volume of County tow calls, in May 2020, Lemaster reached out to dispatchers after hearing on radio that no tow trucks were available, when Lemaster Towing had not been called and had a truck

---

[1]     The Lemasters appear to believe that the "smear campaign" began earlier, as Plaintiffs have posited that the smear campaign prompted Lemaster's August 2019 Facebook post about Carter and McKenzie's relationship status.  (Doc. # 58 at 3).

available.  (Doc. # 58 at 8).  The dispatcher simply told Lemaster that he would have to talk to the Judge.  (*Id.*).  Barbara Howard, another Lawrence County dispatcher, stated in her deposition that Carter ordered her not to call Lemaster Towing, and that the call logs only show when Lemaster Towing was prompted by the rotation, not when it was actually called.  (*Id.*).  Plaintiffs believe that this testimony refutes the Defendants' argument that the number of calls were even across towing companies.  (*Id.*).  Kelli Fugitt, another dispatcher, testified that she had received a similar directive as Howard.  (*Id.* at 9).  According to Howard, since May 2020, there has been a back-and-forth as to directions between Carter and dispatch about whether to place tow calls to Lemaster Towing.  (*Id.*).  The Lemasters state that from that point until briefings on the instant Motion, their towing business "continue[s] to receive zero to one towing calls per month because of Defendant Carter's interference."  (*Id.* at 10).

The Lemasters filed suit in February 2020, against Carter in his individual capacity and official capacity as Judge Executive, and against Lawrence County, alleging violations of Section 1983 under the First Amendment, the Kentucky Civil Rights Act ("KCRA"), and an additional claim of tortious interference with a contract.  (Doc. # 1).  The Court granted Judgment on the Pleadings in favor of Defendants with respect to all claims against Carter in his official capacity, the KCRA claim, and the tortious interference claim with respect to Lawrence County.  (Doc. # 40).  Thus, the remaining claims are (1) a Section 1983 claim against Carter individually, (2) a Section 1983 claim against Lawrence County, and (3) a tortious interference claim under Kentucky law against Carter individually.  (*See id.*).  Defendants have moved for Summary Judgment on all three remaining claims.  (Doc. # 53).

6

### III.      ANALYSIS

#### A.      Standard of Review

A motion for summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, no genuine dispute exists where *no* reasonable jury could return a verdict for the nonmoving party.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).  The moving party bears the burden of showing the absence of a genuine issue of material fact.  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Lastly, the Court must draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

After the Court's entry of Judgment on the Pleadings (Doc. # 40), the remaining claims in this lawsuit are (1) a Section 1983 claim against Carter in his individual capacity, (2) a Section 1983 claim against Lawrence County, and (3) a tortious interference claim against Carter in his individual capacity.  (*See id*.).  Defendants have moved for Summary Judgment on all three remaining claims.  (Doc. # 53).  In their Motion for Summary Judgment, Defendants have claimed that Carter is entitled to qualified immunity as a defense to the claims against Carter in his individual capacity.  (*Id.* at 18).  For the reasons stated herein, Defendants' Motion will be **granted**, and judgment will be entered in their favor.

7

**B.     1983 Claim Against Carter in Individual Capacity**

To state a First Amendment retaliation claim under Section 1983, Plaintiffs must show that (1) "[they] engaged in constitutionally protected conduct; (2) an adverse action was taken against [them] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that the adverse action was motivated at least in part by [the] protected conduct."   *Boxill v. O'Grady*, 935 F.3d 510, 517-18 (6th Cir. 2019) (quoting *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012)).  Based on the record, the Court has determined that while a reasonable juror could find for the Lemasters with respect to the first and second elements, no reasonable juror could find for the Lemasters with respect to the third.  As such, summary judgment must be granted in favor of Defendant Carter on this claim.

**1.     *Billy Lemaster engaged in protected speech with respect to his Facebook posts in August 2019 and March 2020.***

In the context of the First Amendment, constitutionally protected conduct is any speech that may be "fairly characterized as constituting speech on a matter of public concern."  *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 573 (6th Cir. 1997) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *see also Lucas v. Monroe Cnty.*, 203 F.3d 964, 973-74 (6th Cir. 2000).  To determine whether speech relates to a matter of public concern, courts examine "the content, form, and context of a given statement, as revealed by the whole record."  *Mosholder v. Barnhardt*, 679 F.3d 443, 449-50 (6th Cir. 2012) (quoting *Connick*, 461 U.S. at 147-48).  "[T]he pertinent question is not *why* the [plaintiff] spoke, but *what* he said."  *Id.* at 450 (quoting *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004)) (emphasis added).  Thus, speech on a matter of public concern "involves issues about which information is needed or appropriate to

8

enable members of society to make informed decisions about the operation of their government." *Van Compernolle v. City of Zeeland*, 241 F. App'x 244, 249 (6th Cir. 2007) (quoting *Farhat*, 370 F.3d at 590)).   In other words, courts focus on "the distinction between matters of public concern and those of private interest, 'not [between] civic-minded motives and self-serving motives.'"   *Mosholder*, 679 F.3d at 450 (quoting *Chappel*, 131 F.3d at 575) (alteration in original)).   A communication need not be "'utterly bereft of private observations [ ] or expressions of private interest' to be considered related to the public interest."   *Id.* at 450-51.   At the same time, however, a mere "passing" or "fleeting" reference to a public matter "do[es] not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of the speech advances only a private interest." *Farhat*, 370 F.3d at 592-93.   Here, Plaintiffs assert that three Facebook posts by Billy Lemaster constitute protected speech: one in April 2019, one in August 2019, and one in March 2020.  (Doc. # 58 at 12 and 13).

In April 2019, Billy Lemaster made a Facebook post criticizing Lawrence County for firing an EMS employee.  (*Id.* at 1).  According to Lemaster, Defendant Carter asked Lemaster to remove the post because it reflected poorly on him and his administration as Judge Executive, and Lemaster complied, deleting the Facebook post.   (*Id.* at 2). Because it was deleted, the Court does not have a copy of the April 2019 post.  However, given that Carter himself believed the post reflected on his administration as Judge Executive (Doc. # 53 at 2), which is a part of the Lawrence County municipal government, it seems apparent that the April 2019 post was about a matter of public concern, as the post very much involves "the operation of [ ] government."   *Van Compernolle*, 241 F. App'x at 249 (internal quotations omitted).   As such, the Court

concludes that Lemaster's April 2019 Facebook post was constitutionally protected speech.

Next, Plaintiffs allege that Lemaster's August 2019 Facebook post was constitutionally protected, as it was about "Carter's actions relating to Lemaster's alleged mismanagement of the [Cherryville] fire department."  (Doc. # 58 at 13).  The post itself is a rhetorical question: "Is Phillip L. Carter (tag included) and Wilma McKezie [sic] a couple now? Asking for a friend[.]"  (Docs. # 46 at 4-6 and 44-1).  The Lemasters argue that the post was "in response to Judge Carter using Wilma McKenzie to spread disinformation that the Lemasters were mismanaging fire department funds," which is "directly related to the use of [public] funds," making the post of public concern.  (Doc. # 58 at 13).  However, as this Court has previously reasoned, "this background tends to show that Billy Lemaster perceived that Judge Carter was engaging in personal attacks against him, which motivated the Facebook post."  (Doc. # 50 at 9).  Moreover, the "pertinent question is not *why* [the plaintiff] spoke, but *what* he said."  *Farhat*, 370 F.3d at 591 (emphasis added).  Even if Lemaster's August post was motivated by or "in response to" a public concern, that motivation is legally irrelevant.  The post itself did not mention the Cherryville Fire Department, an investigation into mismanagement of funds, or any other matter "about the operation of [ ] government."  *Van Compernolle*, 241 F. App'x at 249 (internal quotations omitted).  Instead, the post is solely and entirely about Carter's personal life – asking a rhetorical question to suggest that Carter and McKenzie are in a personal relationship.  (*See* Doc. # 46 at 4-6).  Unfortunately for Lemaster, questions and statements about personal lives are not of public concern, and thus, the Court finds that his August 2019 Facebook post is not constitutionally protected.

Lastly, Lemaster alleges that a Facebook post in March 2020 is constitutionally protected. In that post, Lemaster again commented on an alleged relationship between Carter and McKenzie, colorfully referring to her as a "holler hag" and as Carter's "one true love," but this time, Lemaster also commented on Carter's investigation of the Cherryville Fire Department. In full, the March post read:

> Oh the holler hag Wilma McKenzie and Phil Twotter are at it again god love their black hearts [ ] maybe before assuming someone is doing something for pure pleasure maybe they should ask for answers from the horses mouth! I don't keep a fire engine parked outside for my own pleasure I park it there because it's the only safe place since we were lied to by the county Judge! After pissing him off talking about his one true love Wilma we were shafted on our building project! Now 8000$ dollars are lying on the floor and will not be moved out of fear of being accused of stealing yet again! Phil promised to help us fix up the place then proceeded to call the building inspector on us!

(Doc. # 53 at 6). According to Lemaster, this March 2020 post was also in response to Carter's attempted dismantling of the Cherryville Fire Department. (Doc. # 58 at 7). More specifically, Lemaster posits that the post is constitutionally protected because it references Cherryville's purchasing of $8,000 worth of equipment for repairing its building, which was later stopped by a building inspector who Lemaster alleges was sent by Carter. (Doc. # 58 at 7). As this Court previously stated, "this post draws attention to Judge Carter's alleged abuse of power, waste of public resources, and interference with repairs to the Cherryville Fire Department[.]" (Doc. # 50 at 10). As such, the March post is more closely related to matters of public concern. *See, e.g.*, *Chappel*, 131 F.3d at 576 ("public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law") (internal quotations omitted)). However, the determination is close, as it could also be said that the reference to public matters are "passing" or "fleeting" and insufficient as the "focus . . . of the speech advances only a private interest."

*Farhat*, 370 F.3d at 592-93.   But at summary judgment, the Court notes that only a genuine issue of material fact is necessary for the claim to survive, and thus, the March 2020 post is constitutionally protected.   At this stage, the Lemasters' 1983 claim against Carter in his individual capacity advances with respect to the deleted April 2019 Facebook post and the March 2020 Facebook post.

> **2.     The Lemasters suffered an adverse action when Carter removed Lemaster Towing from the tow rotation list, and his intentions in doing so are irrelevant.**

In the context of First Amendment retaliation claims, an adverse action is "one that is capable of deterring a person of ordinary firmness from exercising the constitutional right in question."   *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (internal quotations omitted).

Here, the Lemasters allege that they suffered an adverse action in September 2019 when Lawrence County dispatchers received an email with instructions from Carter to avoid calling Lemaster Towing and the Cherryville Fire Department.   (Doc. # 58 at 15). The email stated:

> SUBJECT: LEMASTER TOWING AND [CHERRYVILLE FIRE DEPT.]
> PER JUDGE CARTER DO NOT TONE THEM OUT ON ANY FIRE CALLS USE NEAREST DEPARTMENT ST1/2 ST3 AND INEZ LEMASTER TOWING IS NO LONGER ON THE ROTATION LIST[2]

(Doc. # 19-5 at 1).   After Lemaster called Carter to ask about the message a few days later, a second email was received by dispatchers, which read:

---

[2]     "ST 1/2 and ST3" refers to other Lawrence County fire departments.   In the email, Cherryville Fire was referred to as "ST6," which the Court has bracketed for clarity.   (*See* Doc. # 58 at 5).

SUBJECT: DISPATCHING [CHERRYVILLE FIRE DEPT.]

PER JUDGE CARTERR [sic] [CHERRYVILLE FIRE DEPT.] IS STILL TO BE DISPATCHED IF THEY DO NOT MARK UP THEN DISPATCH ST3, ST1/ST2 OR INEZ[3]

(Doc. # 19-7 at 1).  The Lemasters point out that in the follow-up email, Lemaster Towing was not mentioned, which continued the "sudden drop in the amount of towing calls" that started after dispatchers received the first email.  (Doc. # 58 at 5).

The Sixth Circuit has clearly held that "a [defendant] took adverse action against a wrecker service and its operator when the county removed them from the sheriff department's standby towing service call list[.]"  *Anders v. Cuevas*, 984 F.3d 1166, 1176 (6th Cir. 2021) (citing *Lucas v. Monroe Cnty.*, 203 F.3d 964, 974 (6th Cir. 2000)). Defendants argue that Carter's removing of Lemaster Towing from the tow rotation was a miscommunication and "much ado about nothing" in an effort to invoke the *de minimis* exception to adverse action findings under *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999).  The *de minimis* exception notes that "[i]t is not necessarily true, however, that every action, no matter how small, is constitutionally cognizable," as allowing constitutional claims to proceed for *any* injury would "trivialize the First Amendment."  *Id.* at 396-97 (internal quotations omitted).  Thus, *Thaddeus-X* explains that the adverseness inquiry rests in how a "person of ordinary firmness" would or would not be deterred from exercising constitutional rights in the face of the allegedly adverse action.  *Id.* at 396.

Additionally, however, "the *Thaddeus-X* test makes clear that the adverseness inquiry is an objective one," *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002), and this case is directly analogous to *Anders* and *Lucas*, which both dealt with towing companies

---

[3]  *See supra* n.2 regarding abbreviations of towing companies.

removed from tow rotation lists.  *See* 984 F.3d at 1176; 203 F.3d at 974.  Regardless of Carter's intent, it remains true that Carter did remove Lemaster Towing from the Lawrence County rotation – whether by miscommunication or on purpose.

Furthermore, while Defendants make a valid point that Billy Lemaster felt no "chilling effect" from the adverse action, as he continued to make Facebook posts about Carter after the occurrence of the action, the Court notes that the inquiry isn't about the specific defendant in any case.  Instead, it is about any person of "ordinary firmness," as "actual deterrence on the part of the plaintiff is not necessary to state a claim of adverse action."  *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010) (citing *Bell*, 308 F.3d at 606).  As explained in *Thaddeus-X* and its progeny in the Sixth Circuit, the "ordinary firmness" standard goes hand-in-hand with the *de minimis* exception and examines the adverse action objectively instead of the specific plaintiff's mindset or "firmness."  *See Thaddeus-X*, 175 F.3d at 398;  *see also Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005) (discussing the *Thaddeus-X* standard and noting that "the deterrent effect need not be great in order to be actionable.") (internal quotations omitted)).

Thus, while Billy Lemaster's conduct may have been unwise or not of "ordinary firmness," as his speech certainly wasn't "chilled" by the adverse action here, the relevant question is only whether the removal of a towing company from a rotation list is objectively sufficient to constitute an adverse action.  Seeing that the Sixth Circuit has held twice that such a removal is an adverse action and that a lack of intent is not sufficient to invoke the *de minimis* exception, the Court must agree with *Anders* and *Cuevas*, finding that an adverse action exists in this similar case.  984 F.3d at 1176; 203 F.3d at 974.

> **3.** ***In the complete absence of but-for causation, Plaintiffs cannot show causation between the protected speech and the adverse action.***

The next step in the inquiry is establishing a causal connection between the protected speech and the adverse effect. *Anders*, 984 F.3d at 1177. But before moving into the causation analysis, the Court finds it helpful to restate the timeline in this case, refined by the Court's previous findings in this Order, as the timeline has been somewhat confusing since the case's inception. At this point, the Lemasters' claim rests on two Facebook posts made by Billy Lemaster which have been deemed to be constitutionally protected: one in April 2019, and another in March 2020. *See supra* part III(b)(1). The Lemasters first suffered an adverse action when they were removed from Lawrence County's towing rotation in September 2019. *See supra* part III(c)(1).

As previously stated in the Court's Memorandum Opinion and Order on Plaintiffs' Renewed Motion for Preliminary Injunction, this case seems to turn on causation. (*See* Doc. # 50 at 11). At that point in the litigation, the Court only dealt with the March 2020 Facebook post, and found that "the timeline of events [did] not present a straight-forward, causal connection between the March [2020] post and an adverse action." (*Id*. at 12). Specifically, in that Order, the Court found it problematic for Plaintiffs that the protected speech (in March 2020) occurred *after* the beginning of adverse action (beginning in September 2019). (*See id.* at 12 and 13). However, the Court also noted that the adverse action's "back-and-forth" nature, as characterized by the testimony of Barbara Howard, may have continued through July 2020. (*Id.*). But the "back-and-forth" nature was also insufficient, as the Court noted that even a "four-month gap between the protected conduct and alleged adverse action . . . [did] not adequately demonstrate causation" for

purposes of injunctive relief.  (*Id.* at 13) (citing *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)).

At this stage, almost a year later into the litigation, causation issues still present a significant challenge for Plaintiffs, as the addition of the April 2019 post hardly bridges the gap in time.  While the April 2019 post did occur before September 2019, it nonetheless occurred five months before.  Thus, in an apparent effort to remedy the Court's warning that they "cannot rely on temporal proximity alone to make out their prima facie case of retaliatory motive" (*Id.*),  Plaintiffs have produced additional evidence through discovery of a chaotic series of disputes involving Carter, the Lemasters, and the Cherryville Fire Department, for which Billy Lemaster served as Chief.  (*See* Doc. # 58).  Defendants contend that the Cherryville dispute is irrelevant (Doc. # 53 at 15), while Plaintiffs seem to think that it tips the scale on causation in their favor.  (Doc. # 58 at 16).  The Court is inclined to agree with Defendants on this point, albeit not entirely.

Defendants are correct that the facts related to Cherryville aren't assistive to Plaintiffs in their efforts to show causation.  However, the facts aren't assistive not because they're irrelevant or immaterial, but because they actually tend to demonstrate a *lack* of causation in the case.

In this context, causation requires showing that the "protected speech was a substantial or motivating factor of the adverse action."  *Anders*, 984 F.3d at 1177 (internal quotations omitted).  In the Sixth Circuit, there exists uncertainty, however, as to what that means.  In *Anders*, the court explained that case law conflicts over "whether a plaintiff must prove [causation by] a but-for test or whether the plaintiff need only show that the protected conduct was a motivating factor for the action (which switches the burden to

16

the defendant to prove the absence of but-for causation)." *Rudd v. City of Norton Shores*, 977 F.3d 503, 515 (6th Cir. 2020) (citing *Spithaler v. Smith*, 803 F. App'x 826, 829-30 (6th Cir. 2020)).

In short, the "uncertainty" only exists with respect to whether a burden-shifting framework applies.  On one side of the uncertainty, the plaintiffs must show but-for causation, and on the other side, the law provides the plaintiffs with a lower bar, only requiring them to show that the speech was a "substantial or motivating factor" for the adverse action.  *See Rudd*, 977 F.3d at 515.  But if and when plaintiffs are presented with the lower bar, the burden then shifts to the defendants to show an *absence* of but-for causation.  *See id.*  Nonetheless, however, the inquiry remains to be "essentially but-for cause," *Anders*, 984 F.3d at 1177 (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)), as in one case, the Sixth Circuit aptly distilled the "uncertainty" to one question: "[w]ho bears the burden of proving but-for causation?"  *Spithaler v. Smith*, 803 F. App'x. 826, 830 (6th Cir. 2020).

"No matter who must prove but-for causation," though, the requisite causal connection in this type of case cannot and does not exist in the complete absence of but-for causation.  *See id*.  More specifically, on summary judgment, in cases where the facts are undisputed and weigh entirely against causation, the "uncertainty" is mooted, as the plaintiff cannot show but-for causation, and even if the plaintiff could establish a motivating factor, the defendant can readily prove the absence of but-for causation.  *See generally id.* (noting on summary judgment that the court "need not resolve the issue [of conflicting rules on causation] now" where facts show a complete lack of but-for causation).  The instant case is reminiscent of *Spithaler*, in that the facts are not in dispute,

none of the facts can establish but-for causation, and many of the facts can refute it.  *Id.* at 831 ("All told, the [facts], 'taken together,' do not permit a reasonable jury to conclude [causation]." (quoting *Vereecke*, 609 F.3d at 403)).  Thus, in this case, no reasonable jury could find for Plaintiffs on the third element, and summary judgment must be granted on this claim, as explained below.

As previously stated, given the amount of time between the April 2019 and March 2020 Facebook posts and the September 2019 adverse action, Plaintiffs cannot rely upon temporal proximity alone to show causation.  Thus, Plaintiffs need to show "other evidence of retaliatory conduct . . . to create a genuine issue of material fact" as to causation.  *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001).  However, that "other evidence" must still satisfy the "essentially but-for" test that is the legal standard for causation in the Sixth Circuit.  *Anders*, 984 F.3d at 1177;  *see also Spithaler*, 803 F.3d at 830-31 (analyzing temporal proximity and additional evidence, noting that when "taken together" were insufficient to establish causation).

But-for causation refers to a determination "that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  In *Nieves*, the Supreme Court stated that in other words, but-for cause does not exist where "the same decision would have been reached absent [the plaintiff's] protected speech."  *Id.* (internal quotations omitted).  Thus, on this record, but-for causation would not exist where in September 2019, Carter would still have sent the email to dispatchers removing Lemaster Towing from the rotation list in the absence of Billy Lemaster's April 2019 and March 2020 Facebook posts.  The Lemasters posit that Carter "inadvertently admitted to his retaliatory mindset" by testifying in his deposition that

18

he was prompted to send the email after talking with the state fire commission "about Cherryville not responding to calls." (Doc. # 58 at 16). From there, the Lemasters suggest that Carter's conversation with the fire commission was "triggered" by the August 2020 Facebook post, which, in their words, proves causation.[4] (*Id.*). However, the August 2020 post was not protected speech, so their argument is unavailing. *See supra* part III(b)(1).

But even if the "trigger" for the call to the fire commission were the April 2019 post, which seems to be a bold assumption, a chain reaction is hardly but-for causation. A storyline that posits the April post about an EMS worker causing the September call about Cherryville Fire then causing the adverse action against Lemaster Towing is a simply insufficient causal link. The same is true with respect to the March 2020 post. Connections between the Facebook posts and adverse action are too weak for any reasonable jury to find that the Lemasters have shown a causal link in this case. Furthermore, the Cherryville facts seem to weigh *against* causation, as they show additional reasons, other than the Facebook posts, for the adverse action. As previously stated, but-for causation refers to a finding that the adverse action would not have occurred in the absence of the protected speech. *See Nieves*, 139 S. Ct. at 1722. The Cherryville dispute, in providing additional reasons for Carter's "retaliatory mindset" (Doc. #58 at 13), if anything, shows that the adverse action *would* have occurred in the absence

---

[4]   Confusingly, while Plaintiffs state that the August 2020 Facebook post was the "presumptive trigger" for the adverse action, the sentence immediately preceding that statement reads that the trigger "would have occurred prior to September 3, 2019." (Doc. # 58 at 16). The Court assumes a typographical error that meant to reference the April 2019 post, as that is the only post which occurred before September 2019.

of the Facebook posts.  Thus, the facts are not assistive to Plaintiffs in proving causation, as there is a clear absence of but-for causation in this case.[5]

While it appears that Judge Carter may have made questionable choices with respect to the towing rotation, and while there was undoubtedly a personal dispute between the Lemasters and Carter that spilled over into the operations of the county government, this Court is not in the business of mediating personal disputes.  This Court is in the business of adjudicating disputes solely within its limited jurisdiction, and in this case, the Court's jurisdiction rests on a First Amendment claim.  For this constitutional claim to survive, Plaintiffs must show (1) protected speech, (2) adverse action, and (3) a causal connection between the two.  *See Boxill*, 935 F.3d at 517-18.

Even if Carter did have a "retaliatory mindset" in removing the Lemasters from the towing rotation, a "retaliatory mindset" purely stemming from a personal dispute, and even one intensified by a few rash Facebook posts, is unfortunately not actionable under Section 1983 and the First Amendment.  (Doc. # 58 at 16).  After all, "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."  *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  In the modern world of social media, as made clear by this case, it is easy to air one's grievances in a public forum, but airing grievances in a public forum does not always invoke the Constitution and its protections, no matter how messy or problematic the surrounding

---

[5]     As previously noted, the Sixth Circuit in *Anders* held that there was "uncertainty' in the Circuit about the test for causation but noted that even if Plaintiffs can show that the protected conduct was a "substantial or motivating factor" for the adverse action, Defendants can refute that showing by proving the absence of but-for causation.  984 F.3d at 1177.  Here, regardless of the specific test used, there is a clear absence of but-for causation.  Plaintiffs cannot establish it, and Defendants can clearly show its absence.  Thus, causation fails despite the Circuit's "uncertainty."  *See also Spithaler*, 803 F.3d at 830-31.

dispute may be. As previously mentioned, courts are tasked to critically analyze constitutional claims, as "it would trivialize the First Amendment" to hold that every dispute involving public speech is constitutionally actionable. *Thaddeus-X*, 175 F.3d at 397 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). In sum, because no reasonable jury could find for Plaintiffs on this claim, summary judgment must be granted in favor of Defendants on Plaintiffs' Section 1983 claim against Carter in his individual capacity.

### C.   Section 1983 Claim Against Lawrence County

Plaintiffs have also brought a Section 1983 claim against Lawrence County, alleging municipal liability under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). *Monell* and its progeny allow plaintiffs to pursue Section 1983 claims against municipal governments when they suffer constitutional injuries resulting from a municipality's established policies or procedures. *See id.* The requirement of a policy or custom underscores that "municipalities are not, however, liable for every misdeed of their employees and agents." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 363 (6th Cir. 1993). In other words, "municipalities are not vicariously liable in Section 1983 actions merely because they employ someone who has committed a constitutional violation." *Arrington-Bey v. City of Arlington Heights*, 858 F.3d 988, 994 (6th Cir. 2017). However, in some cases, a legally actionable municipal policy "does not have to be written law; it can be created 'by those whose acts or edicts may fairly be said to represent official policy.'" *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) (quoting *Monell*, 436 U.S. at 694). Here, no unconstitutional Lawrence County policy has been shown, and Carter's actions, even if rogue, do not give rise to *Monell* liability.

Plaintiffs point to Section 5 of Lawrence County's Policies and Procedures, which merely states that "[a] wrecker log and rotation will be maintained by Lawrence Co[.] 911." (Doc. # 58 at 11 (citing Doc. # 19-11)).   No question seems to exist as to whether this policy is unconstitutional, as Plaintiffs rely in making their *Monell* argument on Carter's decision-making power instead of on the policy itself.   (*See id.*).   Plaintiffs posit that "it is custom that whatever orders [Carter] gives the dispatchers are going to be followed with no questions asked."   (*Id*. at 12).   Even though "a towing company can only be removed from the County's rotation list via decision by the Board," Plaintiffs argue, the actions of Carter revealed by 911 dispatchers "told a different story."   (*Id.* at 11).   However, in making this argument, Plaintiffs have again shot themselves in their metaphorical foot.   Carter's *violation* of Lawrence County policy does not create a policy – it merely shows that a policy exists, which wasn't followed.   These facts are exactly the type of rogue behavior that *Monell* and its progeny contemplate against.

In the alternate, single-act liability, or *Monell* liability resulting from one act by a final decision maker, requires showing of a "deliberate choice . . . by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).   Discretion to act does not equate to the responsibility of establishing final policy, as the official must have lawful "authority to make municipal policy" to invoke single-act liability.   *Id.*   Here, the Lemasters have shown, if anything, that Carter did *not* have the authority to remove Lemaster Towing from the county tow rotation.   *Monell* liability provides for causes of action against unconstitutional policies enacted by governments and government leaders. Unfortunately for Plaintiffs, even a rogue county official violating a policy is not necessarily

a constitutional violation, and so summary judgment will be entered in favor of Defendants on this claim.

### D.     Tortious Interference Claim Against Carter in Individual Capacity

Lastly, Plaintiffs have alleged a tortious interference claim under Kentucky state law against Carter in his individual capacity.  As a state law cause of action, the tortious interference claim has remained in this lawsuit by supplemental jurisdiction under 28 U.S.C. § 1367.  Having granted summary judgment in favor of Defendants on both federal claims, the Court *sua sponte* dismisses the remaining state law claim for lack of subject-matter jurisdiction without ruling on the merits.  *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).

### E.     Qualified Immunity for Carter

Lastly, while the Court appreciates the parties' completing the record by filing additional notices on qualified immunity, in the face of summary judgment granted in favor of Defendants, the qualified immunity analysis in this case is mooted, as the affirmative defense is only assistive to Defendants in the existence of a prima facie case.  *See Adams v. City of Auburn Hills*, 336 F.3d 515, 520 (6th Cir. 2003) ("Without an underlying constitutional violation, the question of whether [Defendant] is entitled to qualified immunity is moot.").

## IV.     CONCLUSION

Accordingly, **IT IS ORDERED** as follows:

(1)     Defendants' Motion for Summary Judgment (Doc. # 53) is **GRANTED;**

(2)     This matter shall be **DISMISSED** and **STRICKEN** from the Court's active docket; and

(3)     A contemporaneous Judgment in favor of Defendants shall be entered

herewith.

This 26th day of January, 2022.



**Signed By:**

_**David L. Bunning**_    *DB*

**United States District Judge**

K:\DATA\ORDERS\Ashland Civil\2020\20-12 MSJ.docx